Donald E. CAVE Jr., James W. Brown, and John Mantakounas, Petitioners,

v.

NEW CASTLE COUNTY COUNCIL, Churchmans Crossing, LLC; and Leon N. Weiner Associates, Inc. Respondents.

C.A.No. 02A–11–006 SCD.

Superior Court of Delaware. New Castle County.

Submitted April 29, 2004.

Decided June 9, 2004.

Richard H. Cross, Jr., and Amy Evans, Cross & Simon, LLC, Wilmington, Delaware, for the plaintiffs.

Scott G. Wilcox, and Mary A. Jacobson, New Castle County Law Department, New Castle, Delaware, for New Castle County Council.

Richard H. Morse, and John E. Tracey, Young Conaway Stargatt & Taylor, LLP, Wilmington, Delaware, for Churchmans Crossing, LLC and Leon N. Weiner & Associates, Inc.

DEL PESCO, J.

## OPINION

This case is before the Court on a remand from the Supreme Court. Petitioners filed a writ of certiorari seeking review of the approval by New Castle County Council ("Council") of the Record Major Land Development Plan of Churchmans Meadows ("the Plan"). The Plan, developed by Leon N. Weiner and Associates, in cooperation with the Delaware State Hous-

ing Authority, proposes construction of a 145 unit senior housing community on 33.16 acres near the Christiana Mall.

This court initially granted the writ of certiorari, considered the arguments of the parties, concluded that petitioners lacked standing and that there was no procedural due process violation, and dismissed the writ. After a denial of reargument, petitioners appealed the decision. The Supreme Court remanded the matter to this Court, and directed the Court to consider a recently-released decision in *Dover Historical Society v. City of Dover Planning Commission.*[1]

After conferring with counsel, the standing issue was abandoned as a defense and supplemental briefing was provided. This is the decision on remand.

## Summary of Facts

The dispute relates to the placement of a road. The purpose of the road is to ease traffic by providing an additional route between Routes 273 and 7 near the Christiana Mall and the parcel of land at issue. The initial concept for the road, as expressed in a 1997 report called the Churchmans Crossing Study ("the 1997 Study"), contemplated a road which commenced on 273, crossed three parcels of land, and terminated on Route 7 in alignment with Road A. This will be referred to as "Bypass I".[2] The route which gives rise to this dispute commences at the same

location, crosses the same three parcels of land somewhat differently, and ends up on Eagle Run Road which then is designed to intersect with Route 7 at a different location. This will be referred to as "Bypass II".

## Procedural background

This project has a lengthy history which does not require recitation here. It is sufficient to note that after years of communications and much activity, the Department of Transportation issued its No Objection letter on July 1, 2002, removing the last obstacle to the submission of the Plan to New Castle County Council for approval. In August, 2002, the General Manger of the New Castle County Land Use Department ("Department"), Charles Baker, approved the Plan. Such approval meant that the General Manger found the Plan to be in compliance with, *inter alia,* the New Castle County Unified Development Code ("UDC").[3]

The approval process for a major land development requires submission of a plan to County Council for its consent. County Council is limited in the action it may take. It may: adopt a resolution approving the plan, or table the plan and refer it back to the Department, no more than twice, with specific questions relating to compliance with the UDC, state or federal constitutional requirements, or other laws. If referred, a recommendation by the De-

---

1. 838 A.2d 1103 (Del.2003).

2. Reference to Bypass I and Bypass II is strictly for ease of discussion in this opinion. This is not the nomenclature used by the parties.

3. NEW CASTLE COUNTY UNIFIED DEVELOPMENT CODE ("U.D.C.") § 40.31.114. Record plan submission:

\* \* \* \* \* \*

B. *Department review/approval.* If the plan and all supporting documents comply with

this Chapter and any other applicable regulations, the General Manager of the Department shall approve the record plan.

partment reaffirming approval of the plan requires the Council to adopt a resolution of approval.[4]

On September 3, 2002, before the matter was submitted for consideration by County Council, a hearing was conducted before the New Castle County Land Use Committee. At the meeting, the Council members [5] heard from legal counsel and representatives of the developer, Leon Weiner & Associates; Kathy Gregory, the Deputy Director of the Delaware State Housing Authority, the agency providing financing for the project; David B. DuPlessis, of DelDOT; William Rhodunda, Esquire, counsel for Frank Acierno; Charles Baker, the General Manager of the Department of Land Use; James Russell, Donald Kane and Barry Shotwell, local residents; and Dave Jamison, professional engineer and a former employee of DelDOT.

The final event in the approval process occurred at the County Council meeting of September 10, 2002. A number of individuals who had appeared before, appeared again. Of note in the context of this Court's task was the appearance of Nathan Haywood, Secretary of the Department of Transportation. He explained the history of the project and purpose of the 1997 report:

> In 1997, the so called Churchman's Crossing Study was completed and was published. That was a combination of more than 2 years worth of work. Participated in by some of you sitting here in this Council Chamber, more than 200 private citizens, representatives of Del-DOT, from other State and Federal agencies and what have you. And what the Churchmans Study was trying to do, was look at the existing development in

the and around [sic] I–95 adjacent to Churchman's Crossing and to look at the parcels of land which had been zoned by the County for various uses and to do inventory, if you will, of both the existing demands on the system and the potential demands on the system, if in fact all of those parcels of land where in fact develop [sic]to their fullest potential. The conclusions which were made in that study really awesome [sic]. Because what it showed of course was that New Castle County's growth in this particular part of the County had been prodigious and there was lots more to come, if in fact everybody did what they were entitled to do under the New Castle County Zoning. The purpose of this study was to also, to make a series of recommendations about future transportation improvements in and around the area. Not just improvements in the road system, but substantial improvements in transit, substantial improvements in off-road facilities, (bike and pedestrian), improvements in the rail system. One of the chapters in the Churchman's Study dealt with the so called interconnectivity—or so called local circulation road—which would be necessary and prudent and, in fact, beneficial for improved traffic circulation if and when all of that development were to take place.

Something happened in the course of identifying these local circulation roads which, I think looking back on it, is perhaps a shame because people drew some lines on a piece of paper and said these lines could represent road networks which, if sized appropriately, could be able to dissipate traffic

---

4. U.D.C. § 40.31.114(C).

5. Council members present were Chairman Bob Weiner, Karen Venezky, Bobby Woods, Chris Roberts, Rich Abbott, and Penrose Hollins.

throughout the region and carry a certain amount of capacity. If you read that study carefully as we all have and if you look at the footnotes you will see those lines, and they are all purple, I got them here on this map[*sic*], were not intended, they were never intended, to be specific alignments. Rather, they were to simply say if you could stretch a hose from here to that back door, and it was this wide, or this round, it would carry so many gallons of water per minute. You could stretch it straight or you could run it around the floor or you could wheel it in between the desk, but nevertheless, the point was how much water could you get from here to there. OK?

Some people took those maps to heart and said "these are future roads," "these are committed rights-of-way," "these are absolute alignments." They were not. They were never intended to be and there is absolutely nothing in that document that suggests that they are. Further, if you look beyond that document to the actual real estate records of the parcel of land across which those lines were drawn, you'll see very quickly and obviously very clearly, that the Department of Transportation made no effort whatsoever to establish those as committed rights-of-way. Where we could have done so, we would have attempted to take, in fact, ownership of a public right-of-way across private land. We never did—never intended to. Rather, what the document was trying to say was that if this part of New Castle County developed the private interest, the owners of those pieces of land, would have to contribute to both the right-of-way and the [capital] necessary to build those connector roads to wherever they might land— OK? As an adjunct to the, if you will, the public road network along with Del-

DOT is making certain improvements, like Route 273, and what have you.

So, that's the history, if you will with the context and I believe that I'm correct in saying that many people looked onto it; but some people looked on them as committed rights-of-way, which they were not.

Roll the clock forward a little bit to this particular piece of land. It was purchased by the current owner after the Churchmans Study was issued and just prior to the adoption of the UDC. The owner never expected to have any particular alignment cross that parcel. Rather, the owner bought that piece of property with the expectation that it was both zoned appropriately and in turn, both the County and State's overall public interest was an ideal place to build what is described as age-restricted housing. Enter DelDOT which began working with the developer before I got to the Department to try to look at issues not only of access from that parcel onto a public road, but also where an appropriate alignment for this connector might be. I can tell you that we've had just any number of meetings with both the property owner and adjacent property owners to try to look at those issues. A fundamental conclusion is as follows: a connector of some sort between old Route 7 and Route 273 will not only be beneficial, but in fact, essential for the further growth of the parcels of land between those 2 roads.

\* \* \*

I've heard discussion this evening and previously about the alignment of this and its impact on potential wetland. We have surveyed the property and we know exactly that we have about 3/10's of an acre of wetland to put to ____. We also need to build a bridge. When I say we, that is the contractor or the con-

structor of this connector road. Feasible? Its been done up and down the State many, many times. It requires mitigation, it requires the construction of a small bridge, but its perfectly feasible. We are not talking about disrupting Indian remains or any of the parks, ——, or anything of the sort. It's a straight forward engineering problem, which can and will be accomplished at the time that we have the appropriate agreement with adjoining property owners to complete the connector road.[6]

At the conclusion of the meeting, the Council approved the Plan.

### Discussion

The Petitioner makes three arguments in support of its Writ: that the Council failed to create a sufficient record to enable the Court to review its decision; that the Council exceeded its powers by approving an illegal plan; and that the petitioners were denied procedural due process.

### Adequacy of Record

 The writ of certiorari is a writ of error. It lies from the Superior Court to inferior tribunals, such as County Council, to review errors of law, not errors of fact.[7] The only issue is whether there is substantial evidence to support the Council's conclusion, i.e. to conclude that there is no

basis for finding a violation of the UDC.[8] Council is not an administrative agency, it is not compelled to make findings of fact and rulings of law.[9] Council's obligation in a matter such as this is largely ministerial.[10]

There is a record of the proceedings below. The documents, and the testimony received at two proceedings, form the basis for review here and is adequate for the determination which is required.

### Alleged violations of the UDC

 The central issue in this case is whether the plan violates any part of the UDC. Petitioners argue that the Plan does not comply with the local circulation plan as set forth in the 1997 Study, in violation of 40.21.111 which provides:

> To minimize vehicular access points on arterial and collector roads, the Department and DelDOT may, *when the first development occurs in an area,* develop a local circulation plan. The local circulation plan shall identify desired collector or residential collectors within a superblock, areas for frontage-type roads or reverse frontage, and preferred intersection locations. The local circulation plan shall be based on property maps, zoning, and topographic and alignment information. All landowners shall conform to this plan in order to obtain subdivision approval.[11]

**6.** Testimony of Nathan Haywood, Secretary of the Department of Transportation, at the New Castle County Council Meeting, Sept. 10, 2002, (hereinafter "CCM") at 10–12.

**7.** *Mell v. New Castle County,* Del.Ch., C.A. No. 20003NC, Chandler, J. (Apr. 11, 2003) (Mem. Op.), 2003 WL 1919331 at *8 (*citing* WOOL-LEY's PRACTICE IN CIVIL ACTIONS, Vol. 1, §§ 895–97).

**8.** *Godard v Town of Cheswold Board of Adjustment,* Del.Super., C.A. No. 92A–12–002, Steele, J., 1993 WL 489491 (Oct. 15, 1993)

(Order), 1993 Del.Super. LEXIS 336; *Janaman v. New Castle County Board of Adjustment,* 364 A.2d 1241 (Del.Super.1976), *aff'd,* 379 A.2d 1118 (Del.1977).

**9.** *See* DEL. ANN.CODE tit. 29, §§ 10102(1), 10118 (2002); U.D.C. § 40.30.110 (Table).

**10.** *Concord Towers, Inc. v. McIntosh Inn of Wilmington, Inc.,* Del.Ch., C.A. No. 15656–NC, Steele, J. (July 22, 1997) 1997 WL 525860 at *5.

**11.** U.D.C. § 40.21.111. (emphasis supplied)

Petitioner's argument is incorrect. The Study was not a local circulation plan. It was not prepared *when the first development occur* [ed] *in the area.* It is clear from the testimony presented that the existing development created a complicated circumstance which warranted preparation of the Study. Section 40.21.111 of the UDC is not controlling.

Petitioners also argue that the Plan does not comply with UDC 40.20.230. Streets. That section provides that arterial streets must be constructed and designed in accordance with specified DelDOT standards. The argument is that the Plan does not comport with that provision of the UDC because there is a misalignment between Bypass II and existing or planned streets on previously recorded development plans. In support of that argument, petitioners offer a document which was not presented below, indeed, did not even exist at the time of the hearing below. This new evidence cannot be considered at this stage of the proceedings. To the extent the argument was made, without supporting evidence in the proceedings below, it is countered by the testimony of Mr. Haywood and Mr. DuPlessis.[12]

The authority of the Council is extremely limited when reviewing a major land development plan. The Council focused on the limitation of its authority at both the Land Use Committee meeting and at the full Council meeting. It clearly understood that unless it were able to discern a violation of the UDC, and that is the only type of violation which was ever raised or considered, the only action available to it was to approve the plan. Council approved the plan. There is substantial evidence to support that conclusion.

### Alleged Due Process Violation

Petitioners have also alleged procedural due process violations. Adequate public notice pursuant to UDC § 40.31.340 is not disputed.[13] Rather, petitioners argument lies in the nature of the hearing afforded, specifically, reference by Councilman Penrose Hollins that the hearing on September 10, 2002, was the wrong forum for expressing concerns on the merit.[14] It is noteworthy that this argument was abandoned at argument prior to the first decision in this case, leading me to conclude: "It is clear from the briefs and comments at oral argument that the due process argument is deficient."[15]

Petitioners seem to argue that it is up to Council, not DelDOT, to determine compliance of the Plan with all laws. It is rea-

**12.** Testifying at the Land Use Committee meeting, testimony which formed part of the record for the Council's decision, was David B. Duplessis of DelDOT. On the subject of the alignment differences in Bypass I and Bypass II, he stated:

Generally, you know, our position is that we looked at this issue, we determined that the road isn't needed as a bypass, it's needed to disperse the traffic and at the actual location it doesn't, it is not critical that it be aligned with Road A, with, that an alignment that is offset from Road A, that is perfectly acceptable and works.

Testimony of David B. DuPlessis, DelDOT, at the New Castle County Land Use Committee Meeting, Sept. 3, 2002, (hereinafter "LUMC") at p. 32.

**13.** The record indicates that the meeting was advertised in the News Journal, memos were sent to all residents within 300 feet of the property, and a sign was posted in a conspicuous location.

**14.** CCM at 3.

**15.** *Cave v. New Castle County Council, et al.,* Del.Super. C.A. No. 02A–11–006SCD, Del Pesco, J., 2003 WL 21733076 (July 21, 2003) (Mem.Op.) at 6.

sonable to infer from Council's approval that it found no legal error. This Court has reached the same conclusion. There is no merit to the procedural due process argument.

There being no error of law, the Petition for writ of certiorari is dismissed.

IT IS SO ORDERED.